UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KIRTSEN KISSINGER-CAMPBELL,

    Plaintiff,

vs.                                                      CASE NO. 8:08-cv-568-T-27TBM

C. RANDALL HARRELL, M.D., P.A.,
and C. RANDALL HARRELL, M.D.,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** are: (1) Defendants' Motion for Summary Judgment (Dkt. 7), to which Plaintiff has responded in opposition (Dkt. 14); and (2) Defendants' Motion for Partial Judgment on the Pleadings (Dkt. 31), to which Plaintiff has responded in opposition (Dkt. 41).[1] Upon consideration, Defendants' motions are DENIED.

### *Background*

Plaintiff Kirtsen Kissinger-Campbell was employed by Defendants C. Randall Harrell M.D., P.A. ("Harrell, P.A.") and C. Randall Harrell, M.D. ("Harrell") between September or October 2005 and April 2, 2007. (Compl., Dkt. 2, ¶¶ 7, 9). In May 2007, Plaintiff filed a lawsuit for non-payment of overtime, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (Dkt. 2, ¶ 12). In the instant action, Plaintiff contends that Defendants retaliated against her for the filing of that lawsuit by interfering with her attempts to obtain a new job in the medical field. She brings

---

[1] Defendants filed the Motion for Summary Judgment while represented by former counsel. Following substitution of counsel, Defendants filed the additional Motion for Partial Judgment on the Pleadings.

1

claims for retaliation in violation of the FLSA and the private Florida Whistleblower's Act (Counts I and II), as well as claims for tortious interference (Counts IV and V).[2]

Harrell is a licensed cosmetic surgeon who operates the "Fountain of Youth Institute" in Palm Harbor, Florida. (Dkt. 2, ¶ 5). Kissinger was employed at the Fountain of Youth as a "Image Consultant/Assistant Office Manager." (Dkt. 2, ¶ 7). On March 27, 2007, Plaintiff resigned from employment with two weeks' notice, due to changes in her bonus compensation structure. (Pl. Dep. at 47-48, Exh. 3; Harrell Dep. at 111). Plaintiff's final day was April 2, 2007. (Dkt. 2, ¶ 9).

On or about May 29, 2007, Plaintiff filed the FLSA action in state court against Harrell, P.A., which was removed to this Court on June 18, 2007 ("the lawsuit").[3] The complaint and summons were served on Harrell, as registered agent, on June 1, 2007. (Case No. 8:07-cv-1062-T-26MAP, Dkt. 1-3). Plaintiff did not have any discussion with Harrell or her co-workers about not being paid overtime before she resigned. (Pl. Dep. at 80).

Plaintiff contends that although she sent out resumes to approximately five possible employers, she had a difficult time finding a new job. As discussed below, Plaintiff presents evidence that Harrell contacted at least one employer, My Choice Medical, and that he may have contacted other employers.

1.  *My Choice Medical*

During the time she worked for Defendants, Plaintiff was the point of contact between Defendants and My Choice Medical, a cosmetic surgery finance company. (Pl. Dep. at 213, 8). In

---

[2] The Complaint does not include a Count III.

[3] The Complaint alleges that the state court lawsuit was filed on May 25, 2007. (Dkt. 2, ¶ 12), This appears to be incorrect, as the complaint in that lawsuit was signed on May 28, 2007. (Case No. 8:06-cv-1072-T-26MAP, Dkt. 2).

April 2007, one or two weeks after she left the Fountain of Youth, Plaintiff spoke with Donielle DiTota about working for My Choice Medical. (Pl. Dep. at 179). According to Plaintiff, DiTota told her that My Choice was looking to hire a person to work in Florida. (Pl. Dep. at 118, 123). Plaintiff testified that she "was under the impression that I was going to start with them at the end of the month in April and that didn't happen. And, so, I just kept e-mailing and calling to see if they were still looking for somebody because I had been told that they were looking for someone in Florida." (Pl. Dep. at 118).

On July 23, 2007, Plaintiff sent an email to DiTota asking if My Choice Medical was still looking for a personal image consultant. (Dkt. 2, Exh. A). DiTota replied as follows:

> Hi,
> To be honest with you Dr Harrell had called here and spoke with Vincent and myself. In our contract with the Doctors, it states we are not to solicit employees of the Doctors, as the Doctors are not to do so with our employees. Dr Harrell made it **very clear**, that employing you would be breach of contract.
> Although, we do not need anyone in the Florida offices right now, we are unable to use you [*sic*] services as a [personal image consultant] due to our contract with Dr. Harrell.
> I do know that from working with you in the past that you would be a great asset to the company. Unfortunately, my hands are tied. If there are any changes in the near future, I will let you know.
>
> Thank you
> Donielle DiTota

(Dkt. 2, Exh. A) (emphasis in original).

Within weeks to a month after receiving this email, Plaintiff told DiTota that she was the one who contacted My Choice Medical. (Pl. Dep. at 123). According to Plaintiff, DiTota then spoke to Vincent Traposso, My Choice Medical's CEO, who approved Plaintiff's hiring for a position in the company. (Pl. Dep. at 123-24, 127, 119). Plaintiff began working for My Choice at the end of August 2007. (Pl. Dep. at 131). She was not hired for the position in Florida, but was instead hired

3

to cover Nashville and New Orleans. (Pl. Dep. at 128).

Harrell denies having a conversation with DiTota or anyone else at My Choice Medical concerning Plaintiff. (Harrell Dep. at 153-54). By contrast, Scott McAuley, Defendants' Office Administrator, testified during his first deposition that Harrell had a conversation with DiTota about not hiring Plaintiff. (McAuley Dep. I at 52). Specifically, McAuley testified as follows:

> Q: Do you know a Donielle DiTota at My Choice Medical?
> A: Yes.
> Q: Okay. Did you ever have a conversation with her about not hiring Miss Kissinger after she left here?
> A: I did not.
> Q: Do you know if anyone did?
> A: Yes.
> Q: Who would that be?
> A. Dr. Harrell
> Q: Okay. Tell me what you know about that.
> A: It was -- we have a contract or business with My Choice Medical in which they employ consultants to come to our facility. So what was said or what we didn't want happening in terms of the contract was losing our staff to their company.
>
> (McAuley Dep. I at 52).

McAuley testified in a second deposition that he was "mistaken" about this conversation and "mis-answered the question." (McAuley Dep. II at 10).[4]

2.   *Other prospective employers*

Plaintiff also testified that she had two interviews with Dr. Zbella at Medi-Weightloss, and was given a start date. (Pl. Dep. 120, 122). According to Plaintiff, however, Zbella later told her that he was going to hire someone else. (Pl. Dep. at 122). Although Plaintiff testified that she

---

[4] In his second deposition, McAuley testified that Harrell asked him about this deposition testimony the following week. (McAuley Dep. II at 13) Specifically, Harrell asked McAuley: "Scott, did I -- or did you physically hear me talk to Donielle on the phone discussing Ms. Kissinger and I said absolutely not. And he says, well, you had answered one of his questions that I did and I said no, that can't be, and that's what was really talked about." (McAuley Dep. II at 14). Another employee testified that at the end of February, McAuley's office manager duties were removed. (Gamaras Dep. at 7-8; McAuley Dep. II at 7).

believes that Harrell contacted Zbella, Plaintiff does not have any direct evidence to support this contention. (Pl. Dep. at 124).

Eva Gamaras, a former surgical technician at the Fountain of Youth, testified that Harrell "told me that Kirtsen had applied for this job and this job and this job, that he kind of, I don't know, blackballed her in a sense where she couldn't get jobs at certain places. . . ." (Gamaras Dep. at 130). Although Gamaras testified that Harrell did not specifically tell her that he "blackballed" Plaintiff, he did make it known to Gamaras that he had some part in preventing Plaintiff from getting certain positions. (Gamaras Dep. at 134-35). Gamaras and another former employee, Shawnette Incorvaia, both testified that it is their interest for Harrell not to know where they currently work. (Gamaras Dep. at 94; Incorvaia Dep. at 20-21).

In the instant motion for summary judgment, Defendants argue that Plaintiff cannot prove a prima facie case on her claims for retaliation under the FLSA or pursuant to the Florida Whistleblower's Act because there is no evidence that Harrell was aware of Plaintiff's protected activity -- the May 29, 2007 lawsuit -- when he allegedly contacted My Choice Medical, or in fact, that he contacted My Choice after the lawsuit was filed. Defendants also move for summary judgment on Plaintiff's claims for tortious interference, arguing that Plaintiff has not shown a sufficiently definite prospective business relationship with My Choice Medical. As set forth below, the Court finds that Plaintiff has presented adequate evidence to survive summary judgment.

In the motion for judgment on the pleadings, Defendants make three additional arguments with respect to the FLSA and FWA claims: that Plaintiff is not entitled to emotional distress damages under the FLSA, that Plaintiff did not engage in protected activity under the FWA, and that Plaintiff may not sue for post-employment retaliation under the FWA. The Court rejects these

arguments.

## *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## *Discussion*

### *1. FLSA Retaliation*

#### *a. Prima facie case*

In Count II, Plaintiff alleges that Defendants retaliated against her for filing the May 29, 2007 lawsuit for unpaid overtime compensation, in violation of the FLSA. In order to demonstrate a prima facie case of retaliation pursuant to the FLSA, Plaintiff must demonstrate, by a preponderance of the evidence that: (1) she engaged in protected activity protected under the FLSA; (2) she subsequently suffered an adverse action by Defendants; and (3) there is a causal connection between plaintiff's protected activity and the adverse action. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000).

Plaintiff has advanced only one instance of "protected activity," her May 29, 2007 lawsuit, which Defendants do not dispute. The parties have also implicitly agreed that the "adverse action" was Harrell's alleged communication with My Choice Medical, which the Court accepts for purposes of summary judgment. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (to establish Title VII retaliation, the adverse action must be materially adverse to a reasonable employee); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 343-44 (4th Cir. 2008) (discussing and applying *Burlington* to an FLSA retaliation claim); *Jeter v. Montgomery County*, 480 F. Supp. 2d 1293, 1300 (M.D. Ala. 2007) (same).

In the motion for summary judgment, Defendants argue that Plaintiff cannot prove the third element of "causal connection," as there is no evidence that Harrell was actually aware of Plaintiff's May 29, 2007 lawsuit when he allegedly communicated with My Choice Medical. In a related argument, Defendants also contend that Plaintiff cannot prove the second element, as there is no

7

evidence that Harrell's communication with My Choice Medical occurred "subsequent to" the May 29, 2007 lawsuit. Although a close case, the Court finds Plaintiff has identified sufficient record evidence to defeat Defendants' motion.

In order to demonstrate the requisite causal connection, Plaintiff must, at a minimum, provide evidence that Harrell was "actually aware" of Plaintiff's protected activity at the time of the adverse employment action. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993); *Holifield v. Reno,*115 F.3d 1555, 1566 (11th Cir. 1997). The requirement that a decision-maker be aware of the protected conduct is based on common sense, as "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms.*, Inc. 231 F.3d 791, 799 (11th Cir. 2000). The employer's awareness of the protected activity may be established by circumstantial evidence. *Goldsmith,* 996 F.2d at 1163. "[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression." *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir.1997).

The parties do not dispute that Harrell was Harrell, P.A.'s corporate agent. The question is thus whether there is adequate circumstantial or direct evidence that Harrell was aware of the lawsuit when he allegedly contacted My Choice Medical. As an initial matter, the Court notes that in contrast to similar Eleventh Circuit cases, Harrell has not denied that he was aware of Plaintiff's protected activity at the time he contacted My Choice Medical. *Cf. Brungart.*, 231 F.3d at 799; *Clover*, 176 F.3d at 1355; *Wigley v. W. Fla. Lighting, Inc.*, No. 8:04-cv-1524, 2005 WL 3312319 at *6 (M.D. Fla. Dec. 7, 2005). Although a specific disclaimer is not necessary for Defendants to meet

their burden at summary judgment,[5] the Court finds the absence of such a disclaimer probative in evaluating Plaintiff's circumstantial evidence of Harrell's awareness.

It is undisputed that Harrell was aware of Plaintiff's protected activity on June 1, 2007, when he was served with the lawsuit. Although Plaintiff testified that she has no knowledge as to when Harrell contacted My Choice Medical (Pl. Dep. at 122-23), Plaintiff has produced evidence of a timeline suggesting that the communication may have occurred after the lawsuit was filed on June 1, 2007. Specifically, a reasonable inference can be taken that Harrell would have contacted My Choice sometime between mid-April 2007 -- when Plaintiff first spoke with DiTota about a position -- and July 23, 2007 -- when DiTota revealed in the email to Plaintiff that Harrell had contacted her. Accordingly, there is an equal possibility that Harrell contacted My Choice in the approximately six weeks after he learned of the lawsuit on June 1, 2007, as that he contacted My Choice in the approximately six weeks before the lawsuit was filed. Although causation cannot be demonstrated where the decision-maker learns of the protected activity only after the adverse action,[6] the conflicting evidence on this point is for the fact-finder to resolve.[7]

In addition, the Court notes that there is significant direct evidence suggesting Harrell had

---

[5] *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1437, 1438 n.19 (11th Cir. 1991) (noting that the moving party is not required to support its motion with affidavits negating elements of its opponent's claim, but may instead elect to "point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial.")

[6] *See, e.g., Cain v. Geren*, 261 F. App'x 215, 218 (11th Cir. 2008); *Gary v. Hale*, 212 F. App'x 952, 958 (11th Cir. 2007); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that when an employer makes a tentative employment decision before the protected activity, there is no causation where it is carried out after the protected activity).

[7] The Court notes that based on Plaintiff's account of her conversation with DiTota, she was left with the impression that she would be starting with the company in April. Given that she did not start in April, a fact-finder may indeed determine that Harrell's alleged communication occurred in April, before he was served with the lawsuit on June 1, 2007. This is not, however, an inference the Court may make at this stage.

a retaliatory motive of some kind. First, according to Gamaras, Harrell boasted that he had interfered with Plaintiff's applications to possible employers. Plaintiff's testimony that Dr. Zbella at Medi-Weightloss revoked an offer of employment after two interviews substantiates this testimony. Second, Harrell threatened to retaliate against Plaintiff for the filing of the instant action.[8] In light of this evidence concerning Harrell's retaliatory motives, it is for the fact-finder to determine whether Harrell's alleged animus stemmed from Plaintiff's protected FLSA activity or from another source.

Based on this record evidence, including circumstantial evidence of temporal proximity and retaliatory motive, a fact-finder could reasonably determine that the adverse action took place subsequent to Plaintiff's assertion of her FLSA rights and that Harrell was retaliating against Plaintiff for her FLSA activity. For these reasons, Defendants' motion for summary judgment on Plaintiff's FLSA retaliation claim (Count II) is DENIED.

b.  *Emotional distress damages*

In the motion for judgment on the pleadings, Defendants raise an additional argument concerning the availability of emotional distress damages pursuant to the FLSA anti-retaliation provision. The Court agrees with the well-reasoned opinion in *Bogacki v. Buccaneers Ltd. P'ship*, 370 F. Supp. 2d 1201 (M.D. Fla. 2005), which determined that emotional distress damages may be available in FLSA retaliation claims on a case-by-case basis. The "legal relief" specifically allowed

---

[8] Specifically, Gamaras testified that in early 2008, Harrell told her that Plaintiff would be in financial ruins by the time he got finished with her, that Plaintiff was not worth the money he paid her, and that he was going to go after Plaintiff's character. (Gamaras Dep. at 20-21, 33, 51, 63). Plaintiff's former fiance, Joe Barbara, testified that Harrell called him after the instant lawsuit was filed and tried to intimidate him into telling Plaintiff to drop the lawsuit because "she could be faced with a lifetime of payments or wages garnished if she loses." (Barbara Dep. at 40, 43). Although this evidence does not directly reveal a retaliatory animus concerning Plaintiff's FLSA activity, the Court does finds it probative for purposes of the instant inquiry.

by 29 U.S.C. § 216(b) is a "broad formulation" and its "evident purpose" is compensating the plaintiff. *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 934 (11th Cir. 2000) (holding that punitive damages are not available as legal relief). Although the Eleventh Circuit has not specifically sanctioned the award of emotional distress damages in FLSA retaliation cases, it has held that "[e]motional damages are plainly a form of compensatory damages designed to make good the wrong done." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1198 (11th Cir. 2007) (internal quotations omitted) (Rehabilitation Act case).

Accordingly, Defendants' motion for judgment on the pleadings is DENIED with respect to this argument.

## 2. *Florida Whistleblower's Act*

In Count I, Plaintiff alleges a parallel claim pursuant to the private Florida Whistleblower Act ("FWA"), Fla. Stat. §§ 448.101 *et seq.*, which has the same elements and burden of proof as Plaintiff's FLSA retaliation claim. *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000). In the motion for summary judgment, Defendants have incorporated the arguments made with respect to Plaintiff's FLSA claim, which are rejected for the reasons set forth above. Accordingly, Defendants' motion for summary judgment on Plaintiff's FWA claim (Count I) is DENIED.

Defendants have, however, raised two additional arguments in the motion for judgment on the pleadings: (1) that Plaintiff's lawsuit was not protected activity under the FWA because it was not filed during her employment; and, similarly, (2) that the FWA does not cover post-employment retaliation. As set forth below, both arguments are rejected.

The FWA provides, in relevant part, that "An employer may not take any retaliatory

personnel action against an employee because the employee has . . . Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). It is well-established that filing a lawsuit constitutes protected activity,[9] and that no prior notice to the employer is required under § 448.102(3). *Golf Channel v. Jenkins*, 752 So. 2d 561 (Fla. 2000).

Similarly, although the protected activity and adverse employment action occurred after Plaintiff's termination, the Court finds that § 448.102(3) applies to former employees. Confronting a similar issue with respect to the Title VII's anti-retaliation provision, the Supreme Court held that Title VII does protect former employees who receive post-employment negative references following post-employment protected activity. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997). As set forth below, the rationale supporting the Supreme Court's decision in *Robinson* is equally applicable to § 448.102(3) of the FWA.

First, § 448.102(3) is not facially limited to current employees; rather, it prohibits employers from taking retaliatory action against "employees." *Cf. Robinson*, 519 U.S. at 341. Likewise, the definition of "employee" does not include a temporal qualifier. *Cf. id.* at 342. The FWA defines "employee" as "a person who performs services for and under the control and direction of an employer for wages or other remuneration. . . ." Fla. Stat. § 448.101(2). Although the definition uses the present tense -- "performs services"-- this is not conclusive, as the FWA also uses the term "employees" when it is necessarily referring to former employees. For instance, the FWA includes

---

[9] The parties do not dispute that Plaintiff's lawsuit challenged an actual violation of a law, rule, or regulation, as required to proceed under § 448.102(3). *See White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1337 (M.D. Fla. 2005).

remedial provisions for the "reinstatement of the employee," a remedy that would apply only to former employees. Fla. Stat. § 448.103(2)(b); *Robinson*, 519 U.S. at 342. Similarly, the FWA provides a statute of limitation for an "employee" who has been the subject of a retaliatory personnel action, which includes termination. Fla. Stat. § 448.103(1)(a); Fla. Stat. § 448.101(5).[10] In the case of a termination, this provision would again necessarily only apply to a former employee. *Robinson*, 519 U.S. at 343.

Because the term "employee" denotes both current and former employees, the Court finds that it is ambiguous and must be interpreted in accordance with principles of statutory construction. *See Golf Channel v. Jenkins*, 752 So. 2d 561, 564 (Fla. 2000). Under Florida law, "[t]he first principle of statutory construction is that legislative intent must be determined primarily from the language of the statute," and "related statutory provisions should be read together to determine legislative intent." *Id.* The Florida Supreme Court has specifically held that because the FWA is a remedial statute, any ambiguities "should be liberally construed in favor of granting access to the remedy provided by the Legislature." *Id.* at 566.

As noted, the provisions of the FWA, when read together, plainly indicate that former employees are intended to be protected. *Robinson*, 519 U.S. at 345. Further, to not cover former employees would "effectively vitiate much of the protection afforded by [the FWA]," as employers would be free to fire employees who engaged in protected activity. *Id.* Consistent with the liberal construction afforded the FWA, this Court concludes that the opposition provision of the FWA, §

---

[10] The FWA defines "retaliatory personnel actions," as "the discharge, suspension, or demotion by an employer of an employee or any other adverse employment action taken by an employer against an employee in the terms and conditions of employment." Fla. Stat. § 448.101(5).

13

448.102(3), protects former employees.[11] Accordingly, Defendants' motion for judgment on the pleadings is DENIED.

### 3. *Tortious Interference*

In Counts IV and V, Plaintiff alleges that Defendants intentionally interfered with Plaintiff's attempts to find a new job with, among others possible employers, My Choice Medical. Under Florida law, the elements of a claim for tortious interference are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla.1985); *KMS Restaurant Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2004). In the motion for summary judgment, Defendants argue that Plaintiff cannot demonstrate the first element of the claim, that she had a business relationship with My Choice Medical.

Although "[a] protected business relationship need not be evidenced by an enforceable contract," it "must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *cf. Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152 (11th Cir. 2001) (noting that Florida courts have not always required legal rights). The plaintiff must demonstrate a relationship with a particular party,

---

[11] Defendants' reliance on Delaware and New Jersey precedent is not persuasive. First, the cases do not apply Florida law. Additionally, the New Jersey Superior Court case is premised on a New Jersey Supreme Court decision that was issued prior to *Robinson*, which, while not controlling, provides a useful analysis. *See Beck v. Tribert*, 711 A.2d 951 (N.J. Super. 1998) (citing *Young v. Schering Corp.*, 660 A.2d 1153 (1995)). Third, the unpublished Delaware Supreme Court case confronts an entirely different issue: whether an employer may be held liable for taking a retaliatory personnel action against an employee who blew the whistle on a *previous* employer. *See Tomei v. Sharp*, No. 329-2006, 2007 WL 249176, at *2 (Jan. 30, 2007).

rather than a relationship with the general business community. *Dunn v. Air Line Pilots Assoc.*, 193 F.3d 1185, 1191 (11th Cir. 1999) (citing *Ethan Allen, Inc.*, 647 So. 2d at 815). Thus, the essential question with respect to a prospective business relationship is whether there existed "an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc.*, 647 So. 2d at 814.

Plaintiff testified that she contacted DiTota about a position with My Choice Medical, that DiTota told her that My Choice was looking for a person in Florida, and that Plaintiff was "under the impression" that she would start working for My Choice at the end of April. On the other hand, there is no evidence that Plaintiff contacted DiTota between their conversation in April and the July 23, 2007 email, from which an inference may reasonably be drawn that Plaintiff and My Choice had not conclusively established an April start date. Although the evidence is conflicting, the Court finds this sufficient to create an issue of fact as to whether Plaintiff and My Choice had the requisite business relationship. Plaintiff has identified a specific employer, rather than the business community at large. *Cf. Dunn*, 193 F.3d at 1191 (finding no business relationship where pilots alleged defendants interfered with their ability to find employment on all commercial airlines, rather than a particular airline). In addition, Plaintiff has identified a specific position, Florida representative, and an approximate start date at the end of April. *See Nowik v. Mazda Motors of Am. (E.) Inc.*, 523 So. 2d 769, 771 (Fla. 1st DCA 1988) ("[Plaintiff] did not need to have a fixed business relationship, in the context of already having been hired, to have a cause of action if someone maliciously interfered with his legitimate efforts to secure employment.")

Based on the foregoing, Defendants' motion for summary judgment on Plaintiff's claims for intentional interference (Counts IV and V) is DENIED.

## *Conclusion*

Upon consideration, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (Dkt. 7) and Defendants' Motion for Partial Judgment on the Pleadings (Dkt. 31) are **DENIED**.

**DONE AND ORDERED** in chambers this 12th day of January, 2009.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record